## SUPREME COURT.

### The Globe Woolen Company agt. Edmund H. Carhart *et al.*

*Attachment — Facts which entitle party to — When will not be vacated.*

Where shortly before an assignment by a firm for the benefit of creditors individual members of the said firm made drafts of moneys belonging to it much larger than they had been in the habit of making at any one time or during any one month, not for the purpose of meeting obligations of the firm, or even for the payment of individual debts, such drafts are a fraud upon creditors justifying the issuance of attachment against the firm's property; and though the property thus taken be afterwards returned, the attachment should not for that reason be discharged.

*N. Y. Chambers, July,* 1884.

*S. F. Kneeland,* for plaintiff.

*A. J. Vanderpoel,* for defendants.

Van Brunt, J. — In disposing of this motion to vacate the attachment herein, it is not intended in any way to pass upon the validity of the assignment made by the defendants to Nathaniel Whitman. The only question which will be considered is, what is the legitimate inference which is to be drawn from the facts showing the drafts made by the individual members of defendants' firm on the sixteenth and seventeenth days of June, as they are admitted by the defendants. The reckless manner in which Mr. Arnold Davison has sworn as to the drafts made by Mrs. M. L. Carhart from the defendants' firm from January 1, 1884, to June 17, 1884, shows that no reliance whatever is to be placed upon his affirmance of any facts and that his affidavit is entirely unworthy of credit.

Mr. Davison swears that he is an expert accountant, and that since the assignment of the defendants herein, he has made an examination of the books of the firm of Carhart,

Whitford & Co.; that it appears from said books that from the first of January, 1884, to the 17th of June, 1884, inclusive, Mrs. M. L. Carhart drew from the said firm a sum amounting in the aggregate to $40,803.61. This statement was absolutely false. It did not appear that Mrs. Carhart had drawn any such sum; but that from January 1, 1884, to June 17, 1884, she had drawn the sum of about $17,800, and Mr. Davison either could not have examined the books as he swore he did, or he stated that the books showed a state of facts which he knew did not exist. Such recklessness in the making of affidavits has become too common, and is deserving of the severest censure.

The defendants admit the drafts of money by them individually on the sixteenth and seventeenth of June. It is admitted that the moneys so drawn belonged to the firm, and there is no pretense that they were drawn for the purpose of meeting obligations of the firm or even for the payment of individual debts. These drafts were much larger than the members of the firm had been in the habit of making at any one time or during any one month.

The facts show that although the making of an assignment had not been determined upon until the afternoon of the seventeenth, or perhaps had not been discussed yet, that grave difficulties were staring the firm in the face. That unless new capital was procured, the firm could not go on with its business, and that the firm might not be able to meet its obligations as they matured. Under these circumstances, upon finding the individual members of the firm drawing much larger amounts from the firm than they had been accustomed to do, not for the purpose of paying any debts then due, the inquiry naturally arises: why were these drafts made? and I am forced to the conclusion that they were made for the future use of the individual members of the firm. No doubt they thought that the firm would eventually pay all its debts, and they did not intend to defraud their creditors, but they wished to have on hand a little ready money upon which to live while

the process of liquidation was going on, during which they could not expect to receive anything from the assests of the firm, thus secreting property which belonged to their creditors for the purpose of applying it to their own individual uses. It was while the defendants held this money so drawn that the attachment in this case was issued, and the condition of things then must determine the rights of the parties. The defendants then had this money. They had withdrawn it from the reach of their firm's creditors, with the intention of applying it to their individual uses, which they had no right to do, and which was a fraud upon their creditors. If the money had been returned before the issuing of the attachment, an entirely different question might have been presented, but a debtor cannot defeat the rights of a delinquent creditor after his fraud had been discovered by returning the property improperly taken.

Much stress is laid by the defendant's counsel upon the proposition that actual fraud must be shown, and that no proof of such actual fraud had been given in the case at bar. It may be true that the defendants thought that they had a right to take this copartnership property and apply it to their individual uses, but ignorance of the law is no excuse. The law says that such an appropriation by a copartner of copartnership property is a fraud upon the creditors of the copartnership, no matter with what intent it may have been done. The defendants did not intend that this money should go to the payment of their copartnership debts, to which it should have been applied, but they intended to keep and use it for their individual purposes, thereby secreting it and withdrawing it from the creditors of the firm.

I am of the opinion, therefore, that the motion to discharge the attachment should be denied, with costs.